UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:03CV-502-H

TRENT TAYLOR                                                                                                           PLAINTIFF

V.

UNIVERSITY MEDICAL CENTER, INC.,
d/b/a UNIVERSITY OF LOUISVILLE
HOSPITAL, VICTORIA HAMMER, R.N.                                                                    DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Trent Taylor ("Taylor"), was admitted to the emergency room of the University of Louisville Hospital for treatment for arm and head injuries. As a consequence of the events which arose thereafter, Taylor has alleged a variety of claims against the University Medical Center ("UMC") and one of its nurses, Victoria Hammer ("Hammer"). Taylor alleges violations of his rights under 42 U.S.C. § 1983 premised on the Fourth Amendment of the United States Constitution; violations of the Kentucky Constitution and KRS 344, the Kentucky Civil Rights Act; medical negligence; excessive force; assault and battery; false arrest and imprisonment; and intentional infliction of emotional distress. After the completion of all discovery, Defendants have now moved for summary judgment.

I.

On Sunday morning, August 11, 2002, at approximately 10:04 a.m., Taylor was admitted to the Emergency Department of the University of Louisville for treatment of a lacerated right arm and possible head injuries. It is beyond dispute that Taylor was extremely intoxicated and

perhaps under the influence of marijuana as well. His injuries resulted from a fight with a friend at a party during which Taylor put his hand through a window, causing a severe laceration to his arm and possible head injuries. Even the next morning, Taylor's blood alcohol level was above twice the legal limit for DUI. Moreover, Taylor has absolutely no memory of any of the events which occurred at the University Medical Center. The only evidence of them is the testimony of hospital employees and a video surveillance tape.[1]

Upon arrival at UMC, Taylor was belligerent and uncooperative. He used foul language and was described by one triage nurse as being in "somewhat of a rage." According to the unrebutted testimony of UMC personnel, he cursed both staff and other patients and used racial epithets. Medical technicians were able to bandage both of Taylor's arms. Apparently, Taylor was neither coherent nor controllable. As a result of his on-going disruption, however, Taylor was moved to an isolation room that contained a video surveillance camera. The silent videotape and the testimony show similar events.

For the first few minutes Taylor paces about the isolation room apparently yelling or talking. Then he unwraps all of his bandages and continues to pace the room, one point even leaving the room. Shortly thereafter, a number of medical technicians enter the room to reapply all of his bandages. Apparently, Taylor was unable to follow directions or to control himself. At some point Taylor began spitting at medical personnel. Medical personnel decided to place Taylor in restraints on the hospital gurney. In the course of these events, one of the hospital attendants or security guards lightly kicks Taylor's legs, in a successful attempt to move him

---

[1] The videotape recorded frames in a manner that cannot be viewed at normal speed. Observing the videotape amounts to seeing the events at approximately three times the actual speed.

onto the gurney. As the attendants were completing the restraints, the testimony is that Taylor continued spitting at those in attendance. According to the testimony he was spitting both saliva and blood on staff members.

Maurice Alexander appeared to be the last of all the staff members to leave the isolation room. As Alexander left the room Taylor spit on him. Alexander returned to the room, grabbed Taylor's head, turn it to the side and then fit a biohazard spit sock over his head. In the process of grabbing Taylor's head, Alexander may have applied quick contact or a quick slap to the side of his face. During the process of applying the spit sock and the restraints, Taylor can be seen continuing to spit while flailing about in the presence of numerous hospital personnel.

Shortly thereafter, Vicki Hammer, a registered nurse, enters the room with tape in her hand. She places the tape across the area of Taylor's mouth. As she continues to apply the tape, Taylor apparently bit Hammer's fingertip. To extricate her finger, Hammer climbs onto the gurney and places the weight of her knees on Taylor's chest, neck and shoulder areas. After a short struggle, Hammer is able to remove her finger and Taylor is wheeled out of the seclusion room. Thereafter, Taylor was taken to the treatment room where he was intubated and treated. He received a CT scan for his head later that afternoon and his right wrist was sutured by a hand surgeon.

About 3:00 p.m. the Jefferson County Police Department arrived and arrested Taylor, charging him with Assault II. He was taken to jail and ultimately prosecuted. After a mistrial, Taylor subsequently pleaded guilty by an Alford plea to a felony charge of assaulting Hammer. He was sentenced to time served of approximately 10 months in jail awaiting trial.

Taylor claims injury from the physical assault. However, none of the proof establishes

3

any permanent or even temporary physical injury as a result of any of the events. Taylor's primary complaint concerns his humiliation, embarrassment and anguish resulting from the events being publicized on television and the mental anguish he suffered in jail. He alleges loss of income due to jail time and continued loss of income due to the stigma attached to felony offenders.

## II.

Taylor alleges claims of false arrest and imprisonment against UMC and Hammer. He argues that without UMC's complaint he would not have been arrested. While that may be true, it is not a valid basis for asserting a false arrest claim against a private entity. An action for false arrest and imprisonment exists only where the imprisonment is without legal authority. *Smith v. Stokes*, 54 S.W.3d 565, 567 (Ky. App. 2001) (quoting *SuperX Drugs of Kentucky, Inc. v. Rice*, 554 S.W.2d 903 (Ky. App. 1977)); *Fultz v. Whittaker*, 261 F.Supp.2d 767, 783 (W.D.Ky. 2003). The Louisville Police Department clearly possessed the legal authority to arrest and incarcerate Taylor. Without doubt, the police had valid reasons for the arrest. Consequently, no claim for false arrest and imprisonment lies against those such as UMC or Hammer. Taylor's only claim against these Defendants, in theory, might lie for malicious prosecution, a claim which he has not pursued.

## III.

Taylor also maintains a claim for intentional infliction of emotional distress. The tort of outrage, or intentional infliction of emotional distress, is a "gap filler" that provides for recovery only where traditional common law actions do not apply. *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. App. 2001). "Where an actor's conduct amounts to the commission of one of the traditional

torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie." *Id.; see also Fultz*, 261 F.Supp. 2d at 784. Plaintiff does not allege that any action taken by UMC or Hammer was done solely to cause emotional distress. Accordingly, this claim is not viable.[2]

IV.

Taylor next alleges that UMC and Hammer deprived him of certain constitutional rights under the Kentucky Constitution and KRS 344. Taylor may not pursue the state constitutional and statutory claims because there is no private cause of action under Section 1 of the Bill of Rights in the Kentucky Constitution.[3] Taylor has not cited any state statutory vehicle – such as § 1983 – for enforcing state statutory or constitutional rights. Chapter 344 of the Kentucky Revised Statutes, the Kentucky Civil Rights Act, does not apply because that statute covers only employment and housing discrimination. Moreover, Taylor makes no actual viable claim of discrimination based on race or gender.

Taylor also asserts federal constitutional claims under 42 U.S.C. § 1983. To make such a claim one must establish a deprivation of his rights "under color of state law." *See Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). A private entity acts under color of state law when its "actions so approximate state action that they may be fairly attributed to the State."

---

[2] Another difficulty with this claim and others in the absence of actual damage is that Taylor suffered no physical injury from any of the alleged intrusions on his person. The injury he complains of most concerns the mental and financial consequences of his incarceration. However, his arrest and incarceration were entirely legitimate. Taylor has no basis under any of his claims for imposing the blame or causation for the indignity of incarceration upon either UMC or Hammer.

[3] This is presumably the portion to which Taylor refers when he cites his rights to "life and liberty" and "safety and happiness" in "Article I" of the Kentucky Constitution.

*Id.* (citation omitted). Taylor alleged no state action in his amended complaint. He described UMC as a private corporation and Hammer an employee thereof, but made no effort to explain how the conduct of either Defendant amounts to state action. Taylor now argues that state action is present because UMC receives state funding either directly or indirectly through various medical reimbursement schemes and is licensed and inspected by the Kentucky Office of Inspector General. However, these circumstances provide an insufficient basis for finding state action. In *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984), a physician brought a civil rights action against a private hospital and made similar arguments. Among other things, he argued state action existed because: (1) a considerable portion of the hospital revenues were derived from government sources, including Medicare and Medicaid, and (2) the hospital was subject to extensive state regulation. *Id.* at 449-50. The Sixth Circuit expressly rejected both arguments, finding that the actions of the private entity do not become state action merely because the government provides substantial funding to the private party and that state regulation of the private entity, even if "extensive and detailed," is not enough to support a finding of state action. *Id.* at 450-51 (citation and internal quotations omitted).

Taylor has presented no other evidence in the record suggesting a sufficient intermingling of state involvement to support a finding of state action. Absent such evidence, UMC cannot be deemed a state actor and Taylor's claims under 42 U.S.C. § 1983 cannot go forward.

V.

Taylor's remaining claims allege medical negligence, excessive force[4] and assault and

---

[4] The Court refers here to Taylor's allegation of excessive force in Count III of his amended complaint. The Court cannot find a specific cause of action for excessive force other than the standard applied in Fourth Amendment claims asserted pursuant to § 1983. Therefore Count III is simply repetitive of Count I, Taylor's § 1983 claim. Although the Court has already concluded that the § 1983 claim fails for lack of state action, the Court will

battery.[5]  The Court will consider all of these together, as each requires a similar showing of unreasonable force under the circumstances.

A.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)*; See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In reviewing a motion for summary judgment, the Court's role is to determine whether, upon viewing the facts in the light most favorable to the non-moving party, "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  A mere scintilla of evidence does not create a genuine issue of material fact.  *Id.* at 252.  Rather, a genuine issue exists only where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.  To avoid summary judgment, disputed facts must concern an issue of fact that is material to the claim.  In other words, the jury's acceptance of the Plaintiff's factual contention is sufficient to establish the asserted claim.

B.

---

proceed to analyze the substantive merits of any excessive force claim Taylor may have under the familiar § 1983 standards.

[5] Where all of the federal claims are dismissed, a federal court may exercise its discretion to retain jurisdiction and resolve the remaining state law claims.  *Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195, 210-211 (6th Cir. 2004).  Here, the state law claims are very familiar to the Court because the factual underpinning for the state and federal claims are identical.  The Court is familiar with all the facts and has already issued several dispositive rulings.  It is convenient, therefore, for the Court to consider the remaining state law claims.  Neither side will be prejudiced by this Court's immediate consideration of the remaining issues.  Indeed, remand to state court would result in more delay.  For all these reasons, the Court will retain jurisdiction over the remaining state law claims.

To prevail on a claim of excessive force under the Fourth Amendment, Taylor must prove that a state actor effected a seizure of him through use of objectively unreasonable force under the circumstances.[6] *Fultz v. Whittaker*, 261 F.Supp.2d 767, 774 (W.D.Ky. 2003) (citation omitted). To prevail on a claim of common law battery, Taylor must prove intentional contact of a harmful nature. *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000). As a defense to the battery claim, Defendants have a privilege to use reasonable force in self-defense or defense of others. *Restatement (Second) of Torts* §§ 63, 76. To recover for medical negligence Taylor must show that a medical professional deviated from the standard of the reasonably competent practitioner. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982). Finally, in Kentucky physicians have a statutory privilege to use justifiable force in furtherance of medical treatment and with consent of the patient. KRS 503.110(4). While this statutory privilege serves as a defense to a criminal charge, the underlying principle applies with equal force in the civil context. Here, Taylor alleges specifically that "the actions in restraining him, putting a hood over his face, beating him about the head and neck and intubating him were all acts of excessive force and constitute a battery." These same facts are alleged to support the medical negligence claim.

Taylor arrived at University Medical Center with potentially serious injuries. UMC had an absolute duty to care for him. *Grubbs ex rel. Grubbs v. Barbourville Family Health Center, P.S.C.*, 120 S.W.3d 682, 687-688 (Ky. 2003) (discussing the medical duty of care). Taylor has

---

[6] The Court notes that the overwhelming majority of excessive force claims arise out of an encounter with law enforcement officers, usually during an arrest. Such is the prototype "unreasonable seizure" under the Fourth Amendment. Contrasted with that prototype, the present allegations of use of force by hospital personnel during medical treatment are an unusual occasion for an excessive force claim. Nonetheless, a claim of excessive force against hospital personnel could, in theory, succeed, if those personnel acted under color of state law, effected a seizure of the Plaintiff, and used objectively unreasonable force in the process. *See generally Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 898 (7th Cir. 2004) (analyzing excessive force claim against hospital security officer, but finding that it failed on the merits).

not suggested that he did not consent to treatment for his emergency injuries.[7] In fact, under the circumstances, Taylor need not have given consent to treatment. *Tabor v. Scobee*, 254 S.W.2d 474, 477 (Ky. 1953) (stating general rule that consent to medical treatment must be obtained except in emergencies). Moreover, Taylor's mental and physical condition were such that he could not make informed judgments for his own well-being. Even after treatment began, his actions demonstrated an inability to follow medical instructions and an inability to comprehend his need for medical treatment. Taylor's conduct endangered himself, disrupted the medical setting and endangered medical personnel. The evidence of this is unrebutted: Taylor unwrapped his own bandages and would not remain quiet; he disrupted the treatment room to such an extent that he was placed in seclusion; he would not remain quiet or seated in that room; and he spit on medical personnel who attempted to help him.

The need to use restraints on Taylor in these circumstances was acknowledged by everyone. Taylor's counsel agrees that the use of the four-point restraint was reasonable, but argues that a six-point restraint was not. To be sure, an issue in dispute is whether a six point or four point restraint was more appropriate. However, the answer to that question is not material

---

[7] For this very reason, Taylor's battery claim fails. A patient who seeks to recover for battery for unwanted medical treatment must prove, among other things, lack of consent. *Vitale*, 24 S.W.3d at 658. Taylor has not claimed that he refused to consent to medical treatment. He must have therefore revoked his consent at some point. To successfully revoke consent, the patient must:
> (1) . . . act or use language which can be subject to no other inference and which must be unquestioned responses from a clear and rational mind. . . .
> (2) . . . it must be medically feasible for the doctor to desist in the treatment or examination at that point without the cessation being detrimental to the patient's health or life from a medical viewpoint.

*Coulter v. Thomas*, 33 S.W.3d 522, 526 (Ky. 2000). Even if Taylor attempted to revoke his consent at some point, no reasonable jury could find that such an attempted revocation was the product of a clear and rational mind, nor would it have been feasible to cease medical treatment at that point. Taylor needed treatment. He actively obstructed that treatment. The medical personnel could not decline to act.

to any of the claims Taylor makes. The restraints were imposed for medical reasons: Taylor was posing a danger to himself and to others; his conduct jeopardized his health and the health of others. For these reasons, not even Plaintiff's counsel disputes the need for temporary and non-harmful restraint. In the instant legal context, the six point restraint caused no more physical consequence than the four point restraint. Either way, he could not move. The Court finds that the difference between four points of restraint and additional straps around the hip and chest do not amount to an assault and battery or medical negligence.

Similarly, Taylor's counsel admits that hospital personnel were entitled to take action to protect themselves from Taylor's spitting. Taylor argues that hospital personnel could have used personal protective devices which would have been less intrusive on him. Perhaps this is so. Medical personnel took action for medical reasons without any intent to harm the patient. He suffered no injury from the spit sock or the tape applied later. For medical personnel to directly address the hazard of spitting by applying a spit sock does not amount to an assault and battery or medical negligence. Their exercise of medical judgment in these extreme circumstances was reasonable and necessary.

Taylor claims that Hammer assaulted him when she applied tape to the spit sock. Videotape shows that as Hammer applied the tape, Taylor began to struggle violently and bit Hammer's finger. He resisted so strenuously that several additional assistants were necessary to restrain him. Taylor held his bite so strongly that Hammer climbed onto his chest and appeared to place her knee near or on his neck to extract her hand. Under the circumstances, these actions were obviously necessary to have escaped Taylor's bite. Whether some other approach would have worked better is nonmaterial. Hammer extracted herself from Taylor's bite and imposed

only momentary and noninjurious force in the process.

Taylor claims that he was kicked in the process of being loaded onto the gurney for restraint. All of the eyewitnesses either did not observe the incident or minimize it. A review of the tape shows that nothing occurred of a serious nature. It appears that one of the attendants lightly kicked or perhaps only nudged Taylor's feet in an attempt to move him onto the gurney. The videotape reveals neither an intention to cause harm nor actual causing of harm. The activity appears completely inconsequential.

Taylor claims that he was slapped while medical personnel applied the spit sock. Taylor has no memory of the actual events. Every witness testified that after Taylor spit on Alexander as he was leaving the room, Alexander returned, grabbed Taylor's head and turned it away to apply the spit sock. The videotape does not clearly dispute this version of the testimony. Nevertheless, it is possible to suggest that Alexander administered a quick slap as he turned Taylor's face and stabilized it. Even if this transpired, however, the physical contact was so brief and lacking in force as to be legally inconsequential. Even were a jury to reach its decision solely from the videotape, no one viewing it could reasonably conclude that Alexander acted either excessively or caused injury to Taylor.

C.

Every person is entitled to proper medical care and humane treatment, though their own conduct may make it more difficult. Hospital personnel are entitled to take reasonable measures to facilitate their care and to protect patients from their own destructive actions. Hospital personnel are entitled to take reasonable measures to protect themselves so that they may treat a patient without fear of injury. UMC and Hammer did all of these things.

11

The only testimony of record is that the various medical personnel took actions intended solely to secure Mr. Taylor's own safety and the safety of those attending him. One can certainly debate whether six point restraints or a spit sock were necessary or how Alexander grabbed Taylor's head. None of these actions caused actual injury. The medical personnel responded only to unusual provocation and obstinance as they attempted to help a patient. Disagreements between several reasonable emergency options do not create an issue of material fact as to a charge of assault and battery. The Court has thoroughly reviewed all the evidence and concludes that no reasonable jury could find assault and battery, excessive force or medical negligence. Under these circumstances, the Court cannot imagine a jury verdict favorable to Taylor.

The Court will enter an order consistent with this Memorandum Opinion.

cc:   Counsel of Record